**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02943-RMR

PARKER EGBERT, an individual, by and through his *guardian ad litem*, Laura Egbert,

      *Plaintiff*,

v.

ROBERT GRISWOLD,
UNITED STATES OLYMPIC & PARALYMPIC COMMITTEE, a not-for-profit corporation
~~U.S. CENTER FOR SAFESPORT, a non-profit organization,~~ and
DOES 1 through 50, inclusive, whose true names are unknown,

      *Defendants*.

---

**FIRST AMENDED COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

---

      Plaintiff, Parker Egbert ("Plaintiff"), an individual by and through his attorneys Salzano, Ettinger, Lampert & Wilson, LLP, and Erickson Kramer Osborne LLP, alleges as follows:

**NATURE OF THE ACTION**

      1.     This case is a horrific tragedy, where a young man who defied all odds to become a world-class Paralympic swimmer had his life utterly shattered by rape and abuse when he was paired with a team member who was a violent sexual predator.

1

2.      Plaintiff, who is now nineteen years old, was born with autism and has suffered from developmental delay and intellectual disability his entire life.[1] He began receiving over forty hours per week of therapy at eighteen months old, and did not speak his first words until age six. Due to his difficulty communicating in words, he would oftentimes shriek, making visits to public swimming pools as a young child too difficult. Instead, his family built a pool at their home.

3.      After watching Plaintiff's sheer enjoyment and the calmness that came over him in the pool, his mother decided to teach him how to swim at age twelve. By the time he was a senior in high school, Plaintiff finished as the runner-up for the South Carolina state championship in the 200-yard freestyle and placed third in the 100-yard backstroke.

4.      Despite Plaintiff's severe disabilities, and due to what his former swimming coach Karl Kozicki ("Kozicki") described as a "relentless determination to become an Olympian," Plaintiff defied the odds by securing a place on the United States Paralympics Swimming team and competing at the Paralympic Games. *See* Exhibit B, Karl Kozicki Letter.

5.      He was named to the 2020 U.S. Paralympics Swimming national team after having a successful showing at the Paralympic trials in June 2021, and competed in the 100-meter freestyle, 200-meter freestyle, and 100-meter backstroke at the 2020 Paralympic Games, which occurred in August of 2021 due to the COVID-19 pandemic.

---

[1] Plaintiff has been diagnosed with "autosomal dominant neurodevelopmental disorder with hypotonia and variable intellectual and behavior abnormalities" (also referred to as "NEDHIB"), which is associated with "hypotonia, delayed walking, poor speech, intellectual disability, decreased endurance, feeding difficulties, gastroesophageal reflux, and behavior abnormalities." *See* Exhibit A, Plaintiff's Diagnosis from the Greenwood Genetic Center. According to medical professionals, Plaintiff's genetic diagnosis of NEDHIB not only "puts him at a disadvantage when compared to unaffected individuals," but the fact that Plaintiff has had so much success swimming is indeed "miraculous." *See id*.

6.     Plaintiff's rise up the ranks continued in December 2021 when he won three gold medals and a silver medal at the U.S. Paralympics Swimming National Championship in Greensboro, North Carolina, defeating several of his teammates on the U.S. Paralympics Swimming team.

7.     Behind the scenes, however, Plaintiff was being violently and repeatedly sexually assaulted and harassed by his teammate, Defendant Robert Griswold ("Griswold").

8.     Beginning with the Paralympic trials in June of 2021, Griswold made a concerted effort to "befriend" Plaintiff, constantly referring to Plaintiff as his "little buddy." Griswold did this to gain Plaintiff's trust and lure Plaintiff, and Plaintiff's parents, into a false sense of safety.

9.     The grooming intensified in August of 2021, when Plaintiff and Griswold travelled to Tokyo to compete in the 2020 Paralympic Games. As an organizer of the trip to Tokyo responsible for participating athletes, Defendant the United States Olympic & Paralympic Committee ("USOPC"[2]) was aware that Griswold was Plaintiff's de-facto chaperone. Throughout the 2020 Paralympic Games, Griswold ensured that Plaintiff was always seated next to him on plane and bus rides, and was given prolonged unsupervised access to Plaintiff as the two shared a room in the Olympic Village.

10.    In addition to placing Griswold in Plaintiff's bedroom, USOPC assigned Griswold to be a supervisor of Plaintiff, despite the fact that Griswold was a peer team member on the swim team rather than an adult supervisor and had no training or qualifications to serve as a supervisor. It was also during this time in Tokyo that Griswold began his sexual assaults on Plaintiff.

---

[2] Where applicable, the term "USOPC," as used herein, includes all affiliated entities, officers, directors, employees, agents, and/or representatives acting for, on behalf of, or in concert with, Defendant USOPC.

11.     Remarkably, Defendant USOPC and ~~Defendant~~ U.S. Center for SafeSport ("SafeSport"[3]) allowed Griswold to supervise and share a bedroom with Plaintiff without any oversight, despite the fact that USOPC and SafeSport had received reports that Griswold was sexually assaulting other teammates. SafeSport is an independent non-profit entity charged with addressing allegations of sexual abuse of minors and amateur athletes in Olympic sports.

12.     Thereafter, as detailed more fully herein, Griswold's vicious treatment and repeated sexual assault of Plaintiff intensified.

13.     For example, Griswold forced Plaintiff to allow him to shave Plaintiff's pubic area and forcibly sodomized Plaintiff repeatedly against his will.

14.     Griswold repeatedly told Plaintiff that, if he told anyone what happened, Plaintiff "would get in trouble" and "the police would come." In making these threats to Plaintiff, Griswold manipulated Plaintiff's intellectual disability in an attempt to shield his own vicious and unlawful conduct.

15.     Concurrently, USOPC and SafeSport failed to inform Plaintiff's parents of the risks to their son due to his intimate and continuing proximity to Griswold, a known (or at the very least, suspected) sexual predator.

16.     Rather, USOPC and SafeSport took extensive efforts to shield and protect Griswold, much to the detriment of Plaintiff and other team members.

17.     Upon information and belief, USOPC and SafeSport's actions to insulate Griswold and further victimize Plaintiff were due in large part to the fact that Griswold was a premier

---

[3] Where applicable, the term "SafeSport," as used herein, includes all affiliated entities, officers, directors, employees, agents, and/or representatives acting for, on behalf of, or in concert with, ~~Defendant~~ SafeSport.

swimmer, and because Griswold's family was deeply embedded with leaders throughout the U.S. Paralympic swimming community.

18.     Plaintiff's parents learned of Griswold's horrific conduct when Plaintiff shared a story he wrote titled "Spookley and the Hurricane." *See* Exhibit C, Plaintiff's Hurricane Story. The story is about a group of friends who were "brave" in defeating "a powerful hurricane called Hurricane Robert," which Plaintiff referred to as a "monster" that caused "a terrible mess for the Town of Green Meadows." *Id*.

19.     When Plaintiff's parents learned of the story and asked Plaintiff about it, Plaintiff responded that "the hurricane is Robert"—Defendant Griswold. Plaintiff finally revealed to his parents that Griswold had been abusing him. At that time, however, Plaintiff did not mention any sexual abuse (likely due to his fears that the police would come for Plaintiff if he disclosed the sexual abuse, as Griswold had threatened).

20.     Plaintiff's parents expressed their concerns to the USOPC, but the USOPC failed to investigate the issue and summarily and dismissively told Plaintiff's parents that Plaintiff was just fine, and that Griswold posed absolutely no risk to Plaintiff.

21.     Despite USOPC's assurances, between June of 2021 and August of 2022, Griswold repeatedly subjected Plaintiff to violent abuse and rape. On at least one occasion, Griswold raped Plaintiff so viciously that Plaintiff lost bowel control. To this day Plaintiff continues to suffer from persistent and excruciating rectal pain, for which surgery and continuing medical attention is required. This abuse also included, but was not limited to, Griswold shaking, screaming at, and otherwise becoming extremely physically violent with Plaintiff on a daily basis.

22.     This is a civil action for monetary and injunctive relief for injuries sustained by Plaintiff as a result of the acts and omissions of Defendants Griswold, USOPC, ~~SafeSport,~~ and

Does 1 through 50 (the "Doe Defendants") stemming from the prolonged and malicious physical, verbal, and sexual abuse perpetrated by Griswold, and USOPC's ~~and SafeSport's~~ failure to warn, supervise, and/or protect Plaintiff.

23.     It is axiomatic that all individuals deserve to be protected from the lifelong physical, mental, and psychological trauma inevitably resulting from abuse. That expectation is exceedingly heightened when those individuals are in the custody and care of entities such as Defendant USOPC, which frequently assures athletes (as well as their parents and guardians) that it operates and maintains a safe environment and promises to protect athletes in its custody and care. In addition to USOPC's explicit and implicit assurances, USOPC has a Congressionally-created legal duty—pursuant to the *Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017*, Public Law 115-126 (the "Safe Sport Act")—to protect athletes from abuse.[4]

24.     Coupled with obligations imposed on USOPC, the Safe Sport Act mandates that SafeSport, *inter alia*, "serve as the independent national safe sport organization and be recognized worldwide as the independent national safe sport organization for the United States." Safe Sport Act, Sec. 220541(a)(1). ~~The Safe Sport Act imposes a general duty on SafeSport to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse." *Id.* at Sec. 220541(a)(2). The Safe Sport Act imposes additional duties on SafeSport that include, but are not limited to, maintaining and developing appropriate training and oversight practices, policies, and procedures to ensure that SafeSport is fulfilling its congressional mandate. *Id.* at Sec. 220541, Sec. 220542, Sec. 220543.~~

---

[4] *See, e.g., Champion Women Advocacy for Girls & Women in Sports*, *available at* https://static1.squarespace.com/static/57ea59e8e6f2e14e6db2cf08/t/5a996d9c9140b7c6b3d21cdd/1520004508761/SafeSport+Act+and+Center+Bullet+points+2018.pdf (last visited November 10, 2022).

25.    The Safe Sport Act was created in direct response to the numerous allegations of sexual abuse made against personnel involved with USA Gymnastics, USA Swimming, and USA Taekwondo.[5]

26.    Defendant USOPC ~~and SafeSport have~~ expressly acknowledged ~~their respective~~ its duties, and pledged, on numerous occasions, to implement safeguards to supervise and protect athletes for the purpose of preventing abuse like that suffered by Plaintiff and so many others before him. However, USOPC ~~and SafeSport have~~ intentionally and/or negligently failed to uphold ~~their respective~~ its duties, and deliver on ~~their respective~~ its promises, on many occasions throughout the years, as ~~they~~ it did here with Plaintiff.

27.    Defendant USOPC's ~~and SafeSport's~~ failures—and consequently, the ongoing and devastating physical, mental, and emotional pain and suffering that Plaintiff has endured—occurred despite USOPC ~~and SafeSport~~ being notified of disturbing allegations and evidence of Defendant Griswold engaging in similar predatory and abusive behavior on at least one prior occasion.[6]

---

[5] *See* Senator Susan Collins, *At Press Conference with Former Olympic Gymnasts, Senator Collins Urges Colleagues to Support Legislation She Introduced with Senator Feinstein to Protect Athletes from Sexual Abuse* (January 30, 2018), *available at* https://www.collins.senate.gov/newsroom/press-conference-former-olympic-gymnasts-senator-collins-urges-colleagues-support.

[6] Riley Overland, *Two-Time Paralympic Gold Medalist Robert Griswold Suspended By SafeSport* (September 2, 2022), *available at* https://swimswam.com/two-time-paralympic-gold-medalist-robert-griswold-suspended-by-safesport/; Riley Overland, *Paralympic Champion Robert Griswold Accused of Sexually Assaulting Teammate with Intellectual Disability* (October 20, 2022), *available at* https://swimswam.com/paralympic-champion-robert-griswold-accused-of-sexually-assaulting-teammate-with-intellectual-disability/ ("Members of the National Team allege that U.S. Paralympic Swimming leaders ignored complaints against Griswold and hid them from teammates for years.").

28.     In fact, Griswold was added to the SafeSport database in September of 2020 for "allegations of misconduct" in connection with the incident referenced above, "but [] had his suspension lifted" prior to the 2020 Tokyo Games. *See* note 6, *supra*.

29.     The SafeSport database is a resource designed to keep the public informed when individuals connected with the U.S. Olympic and Paralympic Movements are either subject to certain temporary restrictions pending investigation by SafeSport or are subject to certain sanctions after an investigation found them in violation of the SafeSport Code.

30.     Upon information and belief, Defendant USOPC and SafeSport had actual knowledge of multiple prior instances, or at minimum credible allegations, of physical, verbal, and sexual abuse perpetrated by Griswold, yet turned a blind eye and/or conspired to cover-up such allegations, on each occasion. *Id.*

31.     Upon information and belief, Defendant USOPC and SafeSport did so because of Griswold's success as a Paralympic swimmer. Griswold was the recent winner of two Paralympic gold medals and broke the world record in the 100-meter backstroke at the 2020 Paralympic Games in Tokyo, Japan. He was the face of U.S. Paralympic Swimming, having previously been the only American elected to the international Athletes Advisory Group for Para Swimming.

32.     Upon information and belief, Defendant Griswold used his status in the Olympic and Paralympic Swimming community to carry out a systematic pattern of abuse, whereby he would seek out and groom vulnerable athletes, specifically minor and disabled Paralympic athletes living and training at the United States Olympic & Paralympic Training Center located in Colorado Springs, Colorado ("OPTC")—one of two such campuses owned and operated by USOPC.

33.     Once Defendant Griswold had successfully gained an athlete's trust, his true intentions, and his disturbing proclivity for abuse, were set in motion. As Plaintiff put it, "Robert Griswold is a devil to me." *See* Exhibit D, Plaintiff's Letter to USOPC.

34.     Defendant USOPC's failures—highlighted by its decision to allow Plaintiff to share a room and shower with Defendant Griswold without supervision, are especially troubling considering the extent of Plaintiff's disabilities, which include a "history of developmental delay, intellectual disability, and autism spectrum disorder," and significant spinal atrophy. *See* Exhibit A. Plaintiff has the mental capacity of a five-year old.

35.     Importantly, this is not the first time Defendant USOPC has withheld allegations of abuse; conspired with its affiliated entities (including ~~Defendant~~ SafeSport) to cover-up allegations of abuse; failed to properly supervise its own officers, directors, coaches, and athletes; or allowed physical, verbal, and/or sexual abuse to occur under its nose. Many such instances have occurred at the OPTC.[7]

36.     USOPC has a duty under the Safe Sport Act to supervise and protect its athletes. Additionally, by operating the programs and facilities at OPTC, where athletes live and train, and

---

[7] Examples that have resulted in lawsuits include, but are certainly not limited to, *Denhollander, et al v. Nassar, et al*, Case No. 1:17-cv-00029-JCQ-ESG, United States District Court Western District of Michigan (January 10, 2017) and *Gilbert, et al v. United States Olympic Committee, et al*, Case No: 1:18-cv-00981-CMA, United States District Court District of Colorado (April 25, 2018). In addition to the above cases, in February of 2020, former USOPC vice president of sports medicine, Dr. Bill Moreau, filed a whistleblower complaint against USOPC following his dismissal in May of 2019, claiming that his termination was due to his "question[ing] the way top [USOPC] executives handled reports of sexual abuse and mental health concerns" made by, or on behalf of, their own athletes, as well as numerous reports made by him personally during his tenure. *See* John Barr, *Olympic doctor Bill Moreau says he was fired by USOPC for reporting abuses* (February 6, 2020), *available at* https://www.espn.com/olympics/story/_/id/28645700/olympic-doctor-bill-moreau-says-was-fired-usopc-reporting-abuses.

organizing the athletes' competition in Olympic events, USOPC undertook a duty to supervise and protect those athletes. USOPC's duty is heightened with respect to athletes with previously known disabilities such as Plaintiff, who are foreseeably more vulnerable to abuse. Further, Defendant USOPC held out OPTC as a safe place for athletes, and in reasonable reliance on USOPC's representation, athletes put themselves in USOPC's care.

37.     Finally acknowledging its prior failures relating to Defendant Griswold, on August 21, 2022, Defendant USOPC temporarily suspended Griswold from training at the OPTC or competing in events, and has, at least temporarily, removed him as member of the 2022 National Team.[8] Griswold was also stripped of his position on the Athletes Advisory Group for Para Swimming.[9]

38.     For Plaintiff and, upon information and belief, many other Paralympic swimmers, the lasting damage has already been done, and the actions of Defendant USOPC are simply too little, too late. As one member of the Paralympic swimming team explained:

> Negligence and secrecy is what allowed the abuse of some of our most vulnerable teammates on U.S. Paralympic Swimming. . . . Administration and leadership within the organization withheld pertinent information to the safety and well-being of the majority of their athletes to protect the reputation and privilege of a favored individual. They are equally responsible. Had our community been made aware of all previous allegations, something as heinous as that which has

---

[8] *SafeSport Individuals Suspended or Ineligible, List of Individuals Permanently Suspended or Ineligible for Membership* (updated October 10, 2022), https://www.usaswimming.org/safe-sport/individuals-suspended-or-ineligible.

[9] Riley Overend, *Paralympic Champion Robert Griswold Accused of Sexually Assaulting Teammate with Intellectual Disability* (October 20, 2022), https://swimswam.com/paralympic-champion-robert-griswold-accused-of-sexually-assaulting-teammate-with-intellectual-disability/ ("An NPR series from 2018 revealed that people with intellectual disabilities are sexually assaulted at more than seven times the rate of those without disabilities.").

now occurred would have most likely been avoided.[10]

39.     As a direct result of Griswold's egregious and vicious acts, and the repeated failures of USOPC ~~and SafeSport~~ to uphold ~~their~~ <u>its</u> duties and deliver on explicit and implicit promises made regarding the supervision and protection of Olympic and Paralympic athletes that allowed such acts to occur, Plaintiff has suffered severe physical injuries, pain and suffering, and extreme mental and emotional distress, most of which Plaintiff is likely to endure for the rest of his life.

40.     Further, due to the acts and omissions of Defendants Griswold and USOPC~~, and SafeSport~~, as outlined herein, and the devastating impact on Plaintiff, Plaintiff no longer feels safe training at the OPTC, attending Olympic events, or otherwise being in the custody and care of Defendant USOPC. Thus, Plaintiff had to make the difficult decision to leave behind the dream to which he had dedicated his entire life, and one of the only environments where he felt appreciated and accepted.

<b>JURISDICTION AND VENUE</b>

41.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) in that it is a civil action between citizens of different States and involves an amount in controversy in excess of $75,000 (exclusive of interest and costs).

42.     This Court has personal jurisdiction over Defendant USOPC, as it transacts significant business, is headquartered, and has a principal place of business located in the state of Colorado.

---

[10] *See* note 9, *supra* ("An NPR series from 2018 revealed that people with intellectual disabilities are sexually assaulted at more than seven times the rate of those without disabilities.").

43.    ~~This Court has personal jurisdiction over Defendant SafeSport, as it transacts significant business, is headquartered, and has a principal place of business located in the state of Colorado.~~

43.    This Court has personal jurisdiction over Defendant Griswold due to his minimum contacts with the state of Colorado, which include, for example, the years he spent living and training at the OPTC located within the state of Colorado, where a significant amount of the injuries suffered by Plaintiff as alleged herein occurred.

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Defendant USOPC ~~and SafeSport~~ resides, is headquartered, and maintains a principal place of business in the state of Colorado and in this District. And further, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District.

## THE PARTIES

45.    Plaintiff is an individual, who resides in Marion, Iowa. He brings this claim by and through his *guardian ad litem* (proposed), Laura Egbert.[11]

46.    Defendant USOPC is a not-for-profit corporation federally chartered pursuant to the Amateur Sports Act of 1978, 36 U.S.C.A. § 220522 (1994) (the "Amateur Sports Act"), which is organized and existing under the laws of the District of Columbia. Defendant USOPC is headquartered, and maintains its principal place of business, at One Olympic Plaza, Colorado Springs, Colorado 80909.

---

[11] Although Plaintiff is an adult, Plaintiff's attorneys respectfully request that Plaintiff's mother, Laura Egbert, be appointed his *guardian ad litem*. *See* Plaintiff's Petition and [Proposed] Order Appointing *Guardian Ad Litem*, filed herewith.

47.     Defendant USOPC is governed by a sixteen-member board of directors, and has a professional staff, which is headed by Defendant USOPC's Chief Executive Officer, Sarah Hirshland.[12]

48.     ~~Defendant~~ SafeSport is an independent non-profit organization with headquarters in Denver, Colorado.

49.     According to SafeSport, Defendant USOPC also acts as the National Governing Body ("NGB") for several Paralympic sports, including Paralympic swimming.[13]

50.     Defendant Griswold is an individual who, upon information and belief, resides in Freehold Borough, New Jersey, but prior to his suspension by Defendant USOPC, resided at the OPTC, located in Colorado Springs, Colorado.

51.     Defendant Griswold, like Plaintiff, was a member of the U.S. Paralympics Swimming team that competed in the 2020 Paralympic Games. Defendant Griswold was also a member of the U.S. Paralympics Swimming team that competed in Rio de Janeiro, Brazil in 2016.

52.     Defendant Griswold, who has cerebral palsy, secured gold medals in the 100-meter butterfly and 100-meter backstroke at the 2020 Paralympic Games, also breaking the world record

---

[12] About The U.S. Olympic & Paralympic Committee, *available at* https://www.teamusa.org/about-the-usopc/leadership (last visited November 10, 2022).

[13]  U.S. Center for SafeSport, *available at* https://uscenterforsafesport.org/wp-content/uploads/2021/03/NGBlist.060722.pdf (last visited November 10, 2022).

in the backstroke. *See* note 9, *supra*. In addition, Defendant Griswold currently holds American and world swimming records in freestyle, backstroke, butterfly, and the individual medley.[14-15]

53.    Defendant Griswold also "carries significant influence in the para-swimming world … because he helped create the algorithm that decided [the] Tokyo Paralympic roster selections and relay lineups for the U.S. National Team." *See* note 9, *supra*.

54.    Defendant Griswold's family is also heavily entrenched in the sport of swimming in the U.S., with Defendant Griswold's sister being a reporter and social media manager for Swimming World Magazine, and Defendant Griswold's father at times being invited, and paid, by Defendant USOPC to oversee certain USOPC-sponsored swim meets. In short, Defendant Griswold and his family have close ties to Defendant USOPC.

55.    At this time, Plaintiff is unaware of the true and accurate names and capacities of the Doe Defendants, and as such, all such unknown entities and/or individuals are sued under fictious names. Plaintiff alleges, however, that each Doe Defendant participated in, and contributed to, the acts and omissions of Defendant USOPC and/or SafeSport, and are therefore responsible, in whole or in part, for said acts and omissions, as well as the harm suffered by Plaintiff, as alleged herein. As it relates to the individual Doe Defendants, Plaintiff alleges that each was an officer, director, employee, agent, and/or representative of Defendant USOPC and/or SafeSport, acting in

---

[14] Anne Lepesant, *Robert Griswold of CNU Breaks 4 American Records at BMC Championship* (February 16, 2016), https://swimswam.com/robert-griswold-cnu-breaks-4-american-records-bmc-championships/.

[15] Importantly, Paralympic athletes are categorized or classified based on their level of disability. Defendant Griswold is in class S8, which refers to "swimmers with coordination affected to a low level" or swimmers who "are at almost full capacity but lack all around muscle power," whereas Plaintiff is in class S14, which refers to swimmers with "intellectual impairment" making it difficult "to understand and apply training techniques and competition strategies." *See* https://lexi.global/sports/swimming/freestyle-backstroke-butterfly/s8 (last visited October 25, 2022).

the course of such employment, agency, and/or representation, and as such, Defendant USOPC and/or SafeSport are vicariously liable for any and all acts or omissions of said individuals, which caused Plaintiff's injuries. In the event the true and accurate names of the unknown entities and/or individuals become known to Plaintiff, Plaintiff shall seek leave to amend this Complaint.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     Plaintiff's Incredible Story of Perseverance and Success

56.     Plaintiff, who is now nineteen years old, was born with autism and has suffered from developmental delay and intellectual disability for his entire life. Plaintiff did not start speaking until the age of six, and currently has the mental capacity of a five-year-old.

57.     Having observed Plaintiff's affinity for being in the family pool, his mother decided to teach him how to swim at the age of twelve. As Plaintiff's mother put it, pool time essentially became a form of "playtime, therapy time."[16]

58.     Shortly thereafter, he began swimming at the local YMCA and participated in the Greenville Special Olympics. Eventually, his parents encouraged him to join Team Greenville—a year-round competitive swim team program in their area. *See* note 16, *supra*. He also found success at the South Carolina state championships. *See id.*

59.     Plaintiff joined the 2020 U.S. Paralympics Swimming national team, and competed in the 100-meter freestyle, 200-meter freestyle, and 100-meter backstroke in the S14 classification at the 2020 Paralympic Games. *See id.*

---

[16] Alex Abrams, *Parker Egbert Is Having More Fun In the Pool, And Its Leading to More Success* (January 12, 2022), *available at* https://www.teamusa.org/USParaSwimming/Features/2022/January/12/Parker-Egbert-Is-Having-More-Fun-In-The-Pool-And-Its-Leading-To-More-Success.

60.     In October of 2021, Plaintiff was formally diagnosed with autosomal dominant neurodevelopmental disorder with hypotonia and variable intellectual and behavior abnormalities (NEDHIB)[17] which his doctors agreed "put him at a disadvantage," stating that "[t]he fact that [Plaintiff] is doing so well with swimming is miraculous." *See* Exhibit A.

61.     In December of 2021, Plaintiff won three gold medals and a silver medal at the U.S. Paralympics Swimming National Championship in Greensboro, North Carolina. *See* note 16, *supra*.

62.     As Plaintiff's mother explained when discussing his success at the event, and how being a member of the U.S. Paralympics Swimming team and his trip to Tokyo, had such a positive impact on Plaintiff:

> When he went to Tokyo, I think it was his first time realizing that there were kids like him … he was looking around … kind of like 'Hey, I fit in here, like these are my friends.' At home, a lot of times he's by himself on the bleachers at meets and stuff like that. Not many people interact with him … so he's enjoying himself. He's happy, and I think happiness produced great results … He grew up overnight.

*Id.*

63.     Plaintiff echoed his mother's sentiments, adding:

> Swimming is my favorite sport of all time, like being peaceful in the water and making new friends and competing in the water … Well, I was in Tokyo with my friends … I think I experienced that Tokyo is a big world, and I saw so many athletes in the Olympic Village training for their big Paralympic Games.

*Id.*

---

[17] Plaintiff's NEDHIB causes hypotonia (i.e., decreased muscle tone), delayed walking, poor speech, intellectual disability, decreased endurance, feeding difficulties, gastroesophageal reflux, and behavior abnormalities. *See* Exhibit A.

64.     After Plaintiff's success at the Paralympics National Championship, Defendant USOPC, through its officers, directors, employees, agents, and/or representatives, approached Plaintiff's parents regarding Plaintiff moving to the OPTC in Colorado Springs, Colorado to live and train, where they guaranteed Plaintiff and his parents that Plaintiff would receive far better training than he had with Team Greenville.

65.     Plaintiff's former coach for Team Greenville, Kozicki, wrote a letter in support of Plaintiff's acceptance into the OPTC, and described what he believed that would mean to Plaintiff. Kozicki stated:

> After working with [Plaintiff] over the last three years I can attest to the fact that he is an amazing young man with a strong family support system. [Plaintiff]'s relentless determination to become an Olympian never wavered even when the Covid delay occurred … I never coached someone as enthusiastic to reach their goal … This opportunity for him to have this experience will carry lifelong benefits.

*See* Exhibit B.

66.     During conversations with Plaintiff's parents, Defendant USOPC assured Plaintiff and his parents that the OPTC was a safe environment for all Olympic and Paralympic athletes, and that it had special guidelines in place to ensure the protection of athletes who, like Plaintiff, suffered from disabilities making them particularly vulnerable to abuse. Due to, among other things, the sheer number of complaints of abuse made to, and learned by, Defendant USOPC over the years, USOPC knew or should have known at the time of making the above statements that they were false.

67.     After much deliberation, and relying on Defendant USOPC's representations and assurances, Plaintiff and his parents agreed that he would move to the OPTC so that he could receive better training and continue to follow his dream of being a Paralympic swimmer.

**B.      USOPC's ~~and SafeSport's~~ Obligations and Promises to Protect Paralympic Athletes**

68.      In 1978, via the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, *et seq.* (the "Amateur Sports Act"), Congress set forth the purposes and obligations of Defendant USOPC.

69.      Pursuant to the Amateur Sports Act, Defendant USOPC's purpose is, *inter alia,* to "establish national goals for amateur athletic activities and encourage the attainment of those goals"; "to coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition, to foster productive working relationships among sports-related organizations"; "to foster the development of and access to amateur athletic facilities for use by amateur athletes and assist in making existing amateur athletic facilities available for use by amateur athletes"; and "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." 36 U.S.C. § 220503.

70.      Among its obligations, USOPC was tasked with creating NGBs to oversee each Olympic and Paralympic sport. *Id.* While Defendant USOPC has created, and delegated its duties to, a number of NGBs, such as USA Gymnastics, USA Basketball, and USA Swimming, according to SafeSport, Defendant USOPC itself acts as the NGB and "governs and manages the Paralympic program" for, among other sports, swimming and track and field. *See* ¶ 50 and note 13, *supra.*

71.      Thus, when it comes to Paralympic Swimming—the sport in which both Plaintiff and Defendant Griswold competed—Defendant USOPC is responsible for ensuring that the sport and its athletes are "free from abuse, including emotional, physical, and sexual abuse." *See* ¶ 69, *supra.*

72.      USOPC's duties that stem from the Amateur Sports Act are buttressed by additional responsibilities that are set forth in the *Protecting Young Victims from Sexual Abuse and*

*Safe Sport Authorization Act of 2017* (the "Safe Sport Act"). Via the Safe Sport Act, Defendant USOPC has a legal duty to protect athletes from abuse. *See* ¶ 23 and note 4, *supra*.

73.     In furtherance of its goal to create and develop facilities to be used by Olympic and Paralympic athletes, in 1978, Defendant USOPC also opened the OPTC, where Olympic and Paralympic athletes train, compete, and reside in preparation for the Olympic and Paralympic Games.

74.     With the creation of the OPTC, and the decision to invite athletes to reside and train at the OPTC for extended periods of time, Defendant USOPC maintains a legal duty to supervise and protect those athletes throughout the time they reside and train at the USOPC. Furthermore, Defendant USOPC, expressly and/or implicitly, promises athletes and their parents and guardians that the OPTC is a safe environment for Olympic and Paralympic athletes, and in fact expressly made such promises to Plaintiff and his parents prior to Plaintiff moving to the OPTC. Plaintiff's parents relied upon USOPC's assurances when they decided to allow Plaintiff to move from South Carolina to Colorado to be under the care and supervision of USOPC.

75.     Defendant USOPC's duty to supervise and protect its athletes is heightened when it comes to Paralympic athletes, such as Plaintiff, who have physical and/or mental disabilities that render them especially vulnerable to abuse.

76.     Defendant USOPC's duty to supervise and protect its athletes also extends to the Olympic and Paralympic Games, as athletes, especially Paralympic athletes, are generally left in the custody and care of Defendant USOPC while travelling to and competing at the Paralympic Games.

77.     As explained above, Defendant USOPC has faced significant backlash throughout

the years for instances where it failed to perform its duties with respect to protecting athletes under USOPC's supervision. *See*, *e.g.*, ¶ 35 and note 7, *supra*.

78.     In light of its past failures to adequately protect non-Paralympic athletes from abuse, including sexual abuse, Defendant USOPC should have been particularly cognizant of the risk of abuse to Paralympic athletes, who due to their disabilities need additional support and are particularly susceptible to abuse, including sexual abuse.

79.     In addition to setting forth Defendant USOPC's legal duty to protect its athletes from abuse, ~~Defendant~~ SafeSport maintains an independent duty to investigate and adjudicate claims of abuse in Olympic and Paralympic sports and notify the public of violations of the SafeSport Code. However, since its creation, SafeSport has faced significant scrutiny for its botched handling of abuse claims.

80.     SafeSport was created as an independent organization charged with ensuring that athletes are provided a safe sporting environment (including an environment free from sexual abuse). SafeSport, however, has been widely criticized as being too close to Defendant USOPC and therefore unable to effectively carry out its mission, undermining SafeSport's touted purpose to "Champion Respect. End Abuse." *See* note 13, *supra*.

81.     For example, one comprehensive investigative report found that ~~Defendant~~ SafeSport buries "complaints to lengthy and legalistic oblivion."[18] Given SafeSport's extensive actions to protect those accused of sexual assault—rather than to protect sexual assault victims— attorneys for athletes who experience sexual assault are frequently advised to go straight to the

---

[18] *See* Irvin Muchnick, *Why is the U.S. Olympic Agency Meant to Stop Sexual Abuse Investigating Its Top Critic?*, Salon (Sept. 24, 2022), *available at* https://www.salon.com/2022/09/24/why-is-the-us-olympic-agency-meant-to-stop-abuse-investigating-its-top-critic/.

police rather than deal with the complex and unfair bureaucracy within SafeSport. *See* note 18, *supra*.

82.     A separate investigative report found that ~~Defendant~~ SafeSport is "struggling to gain the trust of the community it is designed to protect."[19] An eighteen-month investigation found significant issues with SafeSport's transparency in its handling of sexual abuse claims and serious questions as to whether SafeSport maintains the necessary independence from the USOPC, as it is required to do. *See* note 19, *supra*. The report also found troubling conflicts of interest regarding funding for SafeSport and noted that in some instances individuals who were found to have sexually assaulted athletes were allowed to return to USOPC facilities and interact with other athletes. *Id*. According to U.S. Senator Jerry Moran, SafeSport has "not demonstrated their capabilities to the degree that we need, that would protect athletes." *Id*.

83.     A report published by Child USA, a national child protection think tank, concluded that SafeSport's policies and practices are "woefully lacking in the basics needed to protect children from abuse and exploitation."[20]

---

[19] *See* Dan Murphy & Pete Madden, *U.S. Center for SafeSport, Olympic Movement's Misconduct Watchdog, Struggles to Shed 'Paper Tiger' Reputation*, ESPN (Feb. 23, 2022), *available at* https://www.espn.com/olympics/story/_/id/33348656/us-center-safesport-olympic-movement-misconduct-watchdog-struggles-shed-paper-tiger-reputation.

[20] Child USA Report (2022), *available at* https://childusa.org/wp-content/uploads/2022/01/Game-Over-Commission-Report-FINAL-1.28.22.pdf.
As one attorney representing women who accused U.S. Tae Kwon Do athletes and coaches of sexual abuse explained: "SafeSport is a puppet of the [USOPC] and they do what the USOPC wants them to do and make[s] sure they protect our coach system." *See* Grace Kier*, Three Years on, Center for SafeSport Faces Controversy* (April 22, 2020), *available at* https://pulitzercenter.org/stories/three-years-center-safesport-faces-controversy#:~:text=The%20Center%20for%20SafeSport%20was%20chartered%20by%20the,body%20to%20investigate%20and%20enforce%20the%20SafeSport%20Code.

### C.   Griswold Grooms and Then Ceaselessly and Horrifically Abuses and Harms Plaintiff

84.   Griswold, knowing that Plaintiff's delayed development, intellectual disability, and autism, in addition to his physical limitations, rendered him vulnerable and naïve to abuse, purposely and maliciously targeted and groomed Plaintiff. Griswold kept Plaintiff and his other victims quiet "us[ing] his power within the para-swimming community … and threaten[ing] retaliation if [they] spoke out." *See* note 9, *supra*.

85.   Beginning with the Paralympic trials in June of 2021, Griswold made a concerted effort to "befriend" Plaintiff, constantly referring to Plaintiff as his "little buddy." Griswold did this to gain Plaintiff's trust, and lure Plaintiff into a false sense of safety.

86.   The grooming intensified beginning in August of 2021, when Plaintiff and Griswold travelled to Tokyo with the USOPC to compete in the 2020 Paralympic Games. Throughout that time Griswold ensured that Plaintiff was always seated next to him on plane and bus rides, and was given essentially twenty-four unsupervised access to Plaintiff, as the two shared a room in the Olympic Village. The USOPC observed Griswold engaging in this conduct and allowed it to continue.

87.   As one member of the Paralympics swimming team explained:

> He [Defendant Griswold] was essentially in charge of the intellectually disabled athletes on our team and would take them everywhere and get them ready … It was a little weird, because us as teammates, we always were like, 'Why isn't there a staff member on the staff to solely take care of these athletes? Robert's got races, he's got stuff to worry about. Why is he in charge of these two guys?[21]

*See* note 9, *supra*.

---

[21] The "two guys" referred to are Plaintiff, and another athlete who roomed with Plaintiff and Defendant Griswold while competing at the Games. The other athlete will be referred to herein as "Athlete No. 1"

88.     During this time, Griswold convinced Plaintiff to allow him to shave Plaintiff's pubic area prior to swimming races, explaining to Plaintiff that doing so would prevent issues with Plaintiff's tech-suit, and also forced Plaintiff to watch as he cruelly harassed Athlete No. 1 while in Tokyo.

89.     Athlete No. 1 also witnessed firsthand the physical, verbal, and sexual assaults Plaintiff suffered at Defendant Griswold's hands, leading said athlete to get angry, and punch the wall of the room where the three athletes were staying. However, before Athlete No. 1 could notify team staff and coaches, Defendant "Griswold … flipped the script and blamed" Athlete No. 1 instead, causing Athlete No. 1 to be "reprimanded by coaches for the outburst." *Id.*

90.     While in Tokyo, Plaintiff began defecating on himself rather frequently despite never having done so before. And, despite having high expectations going into the 2020 Paralympic Games, Plaintiff performed poorly throughout. Both of these sudden changes in behavior were caused by the abuse Plaintiff was enduring on a daily basis from Defendant Griswold.

91.     Upon Plaintiff returning home from the 2020 Paralympic Games, Defendant Griswold would frequently text and call Plaintiff, repeatedly telling him that he was his best friend, and explaining how much he missed and loved Plaintiff. Upon information and belief, it was also Defendant Griswold who initially brought up the idea of Plaintiff moving to the OPTC to live and train, and who initially instructed Defendant USOPC to approach Plaintiff and his parents concerning Plaintiff moving to the OPTC.

92.     Despite Defendant USOPC having been notified of Defendant Griswold's prior incidents of predatory and abusive behavior before January of 2022—when Plaintiff moved into the OPTC—at no time were Plaintiff or his parents made aware of those incidents. Defendant

USOPC's failure to notify or warn Plaintiff and his parents was unconscionable given that Plaintiff and Defendant Griswold were set to, and eventually did, become roommates at OPTC.

93.     Defendant Griswold's grooming of both Plaintiff and his parents, as well as his abuse of Plaintiff, only intensified once Plaintiff moved to the OPTC. Defendant Griswold acted as Plaintiff's chaperone and coach while Plaintiff was at the OPTC, frequently accompanying him around the OPTC, sending Plaintiff's parents pictures, and even calling and texting Plaintiff's parents. Defendant Griswold engaged in this conduct openly and USOPC personnel were aware that he was acting as Plaintiff's chaperone and coach. Defendant Griswold performed these tasks for the purpose of establishing trust between himself and both Plaintiff and his parents.

94.     During this time, Defendant Griswold also told Plaintiff's parents that Plaintiff was underachieving at the OPTC, and that Plaintiff would be kicked out of the OPTC if he did not start working harder, even suggesting that Plaintiff's parents restrict Plaintiff's access to his phone, laptop, and other devices. Believing Defendant Griswold was telling the truth, and with Plaintiff's best interests in mind, Plaintiff's parents agreed to do so.

95.     When Plaintiff's parents eventually talked to Plaintiff's Paralympics Swimming coach in approximately March or April of 2022, they learned that Plaintiff was not underachieving as Defendant Griswold had informed them. In actuality, Defendant Griswold had constructed a false narrative as a way to exert extreme control over Plaintiff and his life.

96.     Further, when Plaintiff continued to lose weight and have frequent uncontrollable bowel movements, Plaintiff's parents contacted members of the nutrition department to inquire as to Plaintiff's health concerns. However, instead of agreeing to work with Plaintiff's parents to develop a plan to assist with Plaintiff's issues, Plaintiff's parents were essentially scolded for questioning Defendant USOPC's handling of Plaintiff.

97.     At no point did Defendant USOPC investigate the situation, or even meet with Plaintiff to discuss what was going on. Defendant USOPC, as they had done previously, simply believed what Defendant Griswold was telling them, placing the blame entirely on Plaintiff.

98.     In April of 2022, with the U.S. Paralympics Swimming team set to travel to Portugal for a swimming competition, Plaintiff's parents reached out to Defendant Griswold concerning Plaintiff's passport, as they had previously given the passport to Defendant Griswold for safekeeping. Defendant Griswold told Plaintiff's parents definitively that he had Plaintiff's passport. Plaintiff's parents later received a call from Defendant USOPC claiming that Plaintiff had lost his passport and it could not be located.

99.     Plaintiff's parents informed Defendant USOPC that they had given Plaintiff's passport to Defendant Griswold, who had assured them earlier that same day that he was still in possession of it. Once again, Defendant USOPC came to Defendant Griswold's rescue, telling Plaintiff's parents to "quit blaming" Defendant Griswold. Upon information and belief, Defendant Griswold had lied to Defendant USOPC and purposely hidden Plaintiff's passport in order to further torture Plaintiff, and was successful in doing so, as the event took a significant emotional toll on Plaintiff.

100.    It was after the event with Plaintiff's passport that Plaintiff began to fight back against Defendant Griswold. Plaintiff refused to take showers, which was where Defendant Griswold would rape and sexually abuse Plaintiff. Plaintiff began calling his parents much more frequently, and, as a means of escape, began writing stories. For example, during this time, Plaintiff wrote a story he titled "Spookley and the Hurricane." *See* Exhibit C.

101.    The Hurricane Story was about a group of friends who were "brave" in defeating "a powerful hurricane called Hurricane Robert," which Plaintiff referred to as a "monster" that caused "a terrible mess for the Town of Green Meadows." *Id.*

102.    When Plaintiff's parents learned of the Hurricane Story and asked Plaintiff about it, Plaintiff responded that "the hurricane is Robert," i.e., Defendant Griswold, who Plaintiff finally revealed to his parents had been physically and verbally abusing him for some time, frequently screaming at him and punching and kicking walls around him.

103.    It was around this same time that Defendant Griswold's communications with Plaintiff's parents began steadily decreasing. In July of 2022, when Plaintiff's parents flew out to the OPTC, Defendant Griswold who had been there to meet them and spend time with them on all prior occasions, actively avoided interacting with them. During this trip, Plaintiff's parents also received a text message from Plaintiff's Paralympic Swimming coach regarding Plaintiff "binge" eating, as Defendant Griswold told the coach that Plaintiff had eaten thirteen bags of cookies in a one-night span.

104.    Indeed, Defendant Griswold had lied, and Plaintiff's parents finally obtained proof of this, after they later located only three bags of cookies eaten in Plaintiff's room—the exact number of bags Plaintiff had told his parents he consumed. Plaintiff's parents subsequently requested to meet with the swimming coach, a meeting in which Plaintiff's parents expressed their concerns regarding Plaintiff's hurricane story, and inquired as to what was going on with Defendant Griswold.

105.    Once again, Defendant USOPC declined to respond to the issue, and the Paralympic Swimming coach reassured Plaintiff's parents that Plaintiff was going to be fine by telling them that Defendant Griswold would be moving out of the OPTC shortly because he was getting

married. Plaintiff's parents relied on the Paralympic Swimming coach's representations and allowed Plaintiff to remain at the OPTC.

106.    It was also during this time in July of 2022 that Paralympic Swimming coaches informed Plaintiff's parents that Plaintiff was refusing to shower, which was abnormal for Plaintiff. Yet, USOPC did not inquire why Plaintiff decided to stop showering or whether the showers were a place where Plaintiff did not feel safe.

107.    When Plaintiff returned to the OPTC in early August of 2022, after Defendant Griswold had left, Plaintiff believed he had escaped Griswold's continuing abuse. Because Plaintiff, at least temporarily, felt he no longer had to fear retaliation from Griswold, he began opening up to his parents about what he had endured.

108.    Specifically, Plaintiff explained that Defendant Griswold had essentially controlled all aspects of his life since the moment he moved into the OPTC, including forcing Plaintiff to pay for Defendant Griswold's meals, controlling when and what Plaintiff was eating, and forcing Plaintiff to do Griswold's laundry. Defendant Griswold had also been steadily alienating Plaintiff from his teammates and others around him, as another way to control Plaintiff and limit the chance that Plaintiff would reveal Griswold's heinous conduct.

109.    Unbeknownst to Plaintiff, and contrary to statements made to Plaintiff's parents by Defendant USOPC, Defendant Griswold returned to the OPTC a few weeks later. Shortly after Defendant Griswold returned, during a Face-Time video call between Plaintiff and his parents, Plaintiff's mother was shocked to see "fear in his eyes."

110.    When she asked Plaintiff if he was okay, he immediately shook his head "no" and began to cry uncontrollably. Plaintiff then told his mother that Defendant Griswold had shaken him violently, causing him to hit his head on the wall.

111.     During the above incident, Defendant Griswold yelled at Plaintiff, saying that he was "dumb," "stupid," and "an idiot." Eventually, Plaintiff explained to his parents that, in addition to screaming at him, punching walls, and slamming doors in their apartment, Defendant Griswold would "hold his [Plaintiff's] wiener" during hydration tests.

112.     Plaintiff's parents immediately phoned the Paralympics Swimming coach and told him that if he did not file a report with SafeSport, they would file one themselves. The Paralympics Swim coach responded that he would do so immediately.

113.     On or about August 21, 2022, Plaintiff finally revealed to his parents the rest of the atrocities that Griswold committed. Plaintiff's parents sat and listened to their son describe outrageous conduct that would horrify any parent.

114.     For example, Plaintiff said: Defendant Griswold "kisses my wiener in the shower," "sticks his wiener in my butt and it is very painful," and when doing so, tells me "this is what I deserve." Plaintiff also told his parents that he had been losing weight and defecating on himself due to the extraordinary pain he felt in his "bottom."

115.     Plaintiff further told his parents that, to keep Plaintiff from disclosing this vicious conduct, Griswold would threaten Plaintiff while sexually abusing him, saying that Plaintiff "would get in trouble" and "the police would come" if he told anyone.

116.     Plaintiff's parents raced to the OPTC to save their son from the rape and torture he had been enduring while in the custody and care of Defendant USOPC.

117.     Since his return home, Plaintiff has continuously told his parents "thank you for saving me from" Griswold, however, to this day, Plaintiff remains fearful that Griswold "knows where they live" and "is going to kill [him]."

118.    Griswold's physical, verbal, and sexual abuse occurred in large part because of the acts and omissions of USOPC ~~and SafeSport~~.

119.    Although Defendant Griswold has thus far not been arrested or charged in connection with the foregoing, "a police report has been filed … law enforcement ha[ve] conducted lengthy forensic interviews … [and] some close to the situation," including Plaintiff's parents, "are optimistic that he arrested soon." *See* note 9, *supra*.

**D.     USOPC's ~~and SafeSport's~~ Acts and Omissions Resulted in Plaintiff Being Left Vulnerable to Predation and Abuse**

120.    As explained above, Defendant USOPC has a legal duty, based in common law doctrines and pursuant to the Amateur Sports Act and the Safe Sport Act, to protect Olympic and Paralympic athletes from abuse, including but not limited to sexual abuse. In fact, the Safe Sport Act, and the legal duty expressly created therein, were a direct result of repeated prior failures by USOPC and its affiliated entities in connection with sexual abuse of minors and amateur athletes in Olympic sports.

~~121.    In addition, under common law doctrines and the Safe Sport Act, Defendant SafeSport has a legal duty to protect Olympic and Paralympic athletes from abuse, including but not limited to sexual abuse. SafeSport also has a legal duty to institute appropriate policies and procedures to fulfill its mission, and to train and supervise those acting under its control, authority, or mandate.~~

121.    Further, by agreeing to house athletes at the OPTC, especially athletes with disabilities such as Plaintiff, USOPC accepted and undertook a duty—throughout the time those athletes were in Defendant USOPC's custody and care—to supervise and protect said athletes.

122.    USOPC also holds out to athletes, as well as their parents and guardians, that the OPTC is a safe place for athletes to live and train and assures them that athletes will be protected

from abuse, and other heinous acts like those committed by Defendant Griswold. In fact, USOPC explicitly promised Plaintiff's parents, during conversations prior to Plaintiff's parents agreeing to let Plaintiff move into the OPTC, that the OPTC was a safe environment, and that they could trust USOPC to supervise and protect Plaintiff—notwithstanding his disabilities—while he was in USOPC's care and custody.

123.    ~~Defendant SafeSport holds out to athletes, as well as to their parents and guardians, that SafeSport will abide by its mandate to protect Olympic and Paralympic athletes from abuse, including but not limited to sexual abuse.~~

124.    ~~Defendant SafeSport also holds out to athletes, as well as to their parents and guardians, that SafeSport will notify and warn athletes when there is a foreseeable and unreasonable risk of harm due to the conduct of coaches, supervisors, or other athletes.~~

123.    Defendant USOPC breached the duties it owed to Plaintiff. Despite its numerous prior failures in connection with supervising and protecting its athletes, and in blatant disregard of its knowledge of Griswold's predatory and abusive behavior, USOPC intentionally and/or negligently failed to supervise, or implement adequate and appropriate safeguards to protect Plaintiff from Griswold's physical, verbal, and mental abuse. To the contrary, Defendants USOPC and SafeSport intentionally, recklessly, and/or negligently permitted Defendant Griswold to continue to perpetrate such abuse.

124.    Defendant <u>USOPC</u> ~~SafeSport~~ breached the duties it owed to Plaintiff. <u>USOPC</u> ~~SafeSport~~ failed to hire and train employees and others who were charged with carrying out its responsibilities; failed to comply with the obligations in the Safe Sport Act, for example, to protect athletes from abuse by, among other things, isolating Defendant Griswold from other vulnerable athletes, monitoring him when he was with other athletes, and using a "two-adult" rule for athletes

lacking capacity like Plaintiff where further supervision was always present to protect Plaintiff from abuse; failed to notify Plaintiff and his parents of the unreasonable and foreseeable risk of harm from Griswold; and failed to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by USOPC ~~SafeSport~~ and bound by the SafeSport Code. ; and failed to take reasonable steps to remain independent from the ~~USOPC~~ SafeSport in making and enforcing safety rules.

125.    The above acts and omissions were carried out by ~~Defendant SafeSport's and~~ Defendant USOPC's own officers, directors, employees, agents, and/or representatives, who were acting for, on behalf of, or in concert with, ~~Defendants USOPC and~~ SafeSport, and in furtherance of their employment and/or with implied or expressed agency relationship with ~~Defendant USOPC and~~ SafeSport. Thus, Defendants USOPC ~~and SafeSport are~~ is vicariously liable for all such acts and omissions of their respective officers, directors, employees, agents, and/or representatives, whom USOPC and/or SafeSport negligently failed to train, supervise, and/or retain.

126.    Because Griswold's acts occurred, as many others before him, at the OPTC, a location where USOPC ~~and SafeSport~~ explicitly and implicitly promises athletes that they will be supervised and protected—and expressly promised such to Plaintiff and his parents—Defendant USOPC ~~and SafeSport~~ intentionally and/or negligently failed to fulfill their respective promises, which promises Defendant USOPC ~~and SafeSport~~ knew or should have known at the time of making them were false. As such, Defendant USOPC ~~and SafeSport~~ made intentional and/or negligent representations to Plaintiff and his parents.

127.    Upon information and belief, USOPC conspired with its affiliated entities, including SafeSport, to cover up allegations of abuse by Griswold because of Griswold's prior

accomplishments and status in the Olympic and Paralympic swimming community, and thus, intentionally and/or negligent failed to warn Plaintiff and his parents of the significant risk of danger which Griswold posed to Plaintiff.

128.   USOPC's acts and omissions, as well as that of its affiliated entities, officers, directors, employees, agents, and/or representatives, for which Defendant USOPC is liable, allowed Defendant Griswold to commit assault and battery on Plaintiff, and to invade Plaintiff's privacy and bodily integrity.

129.   ~~SafeSport's acts and omissions, as well as that of its affiliated entities, officers, directors, employees, agents, and/or representatives, for which Defendant SafeSport is liable, allowed Defendant Griswold to commit assault and battery on Plaintiff, and to invade Plaintiff's privacy and bodily integrity.~~

129.   As a direct result of Defendant Griswold's acts, and the repeated failures of Defendant USOPC ~~and SafeSport~~, as outlined herein, Plaintiff has suffered severe physical injuries, pain and suffering, and extreme mental and emotional distress, most of which Plaintiff is likely to endure for the rest of his life.

130.   Further, due to the acts and omissions of Defendants Griswold and USOPC~~, and SafeSport~~, and the devastating impact on Plaintiff, Plaintiff no longer feels safe living and training at the OPTC, attending Paralympic events, or otherwise being left in the custody and care of Defendant USOPC, and has thus had to make the difficult decision to leave behind his lifelong dream.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Assault and Battery**
**(Against Defendant Griswold)**

131.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

132.    Through the physical, verbal, and sexual abuse committed by him, as outlined herein, Defendant Griswold willfully threatened and/or attempted to inflict injury on Plaintiff. Plaintiff was in apprehension of Griswold's immediate physical, harmful, or offensive contact.

133.    In addition thereto, Defendant Griswold intentionally and wrongfully contacted Plaintiff in a harmful or offensive manner.

134.    As a direct and proximate result of Defendant Griswold's assault and battery, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**Invasion of Privacy**
**(Against Defendant Griswold)**

135.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

136.    Through the physical, verbal, and sexual abuse committed by him, as outlined herein Defendant Griswold intentionally intruded in and upon Plaintiff's solitude, seclusion, private affairs, and concerns of Plaintiff, which intrusion would, without question, be highly offensive to a reasonable person.

137.    As a direct and proximate result of Defendant Griswold's intrusion upon Plaintiff's seclusion, i.e., his invasion of Plaintiff's privacy, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

138.    Because of the extent of the offensiveness of Defendant Griswold's acts, Plaintiff ~~is also entitled to punitive damages to punish Defendant Griswold and deter similar future conduct~~ will also be entitled to punitive damages to punish Defendant Griswold and deter similar future conduct and will move the Court to add a prayer for punitive damages upon completion of initial discovery.

### THIRD CLAIM FOR RELIEF
### Negligence
### (Against Defendant USOPC)

139.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

140.    Defendant USOPC owes a legal duty to protect Plaintiff from physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

141.    For example, under the Amateur Sports Act, Defendant USOPC maintains a legal duty "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." *See* ¶ 69, *supra.*

142.    Moreover, under the Safe Sport Act, Defendant USOPC maintains a legal duty to protect athletes from abuse. *See* ¶ 23, *supra.*

143.    Defendant USOPC's duty to protect Plaintiff is heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more

vulnerable to abuse, and such duty exists at the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC, who explicitly and implicitly promised to care for and protect Plaintiff.

144.    The duty to protect was further heightened due to numerous prior instances in which Defendant USOPC failed to adequately supervise Olympic and Paralympic athletes, and in particular here due to the prior allegation(s) of predatory and behavior by Defendant Griswold, which allegation(s) Defendant USOPC was fully aware of.

145.    USOPC also had a special relationship with Plaintiff given the fact that Plaintiff has developmental disabilities and was under the care and control of USOPC while at USOPC facilities and USOPC events.

146.    Despite the foregoing, Defendant USOPC failed to adequately protect Plaintiff, and in fact, engaged in intentional, reckless, or at minimum, careless behavior, including concealing and conspiring with its affiliated entities, including SafeSport, to cover up Defendant Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed; and allowing Plaintiff to room and shower with Defendant Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

147.    Under the theory of vicarious liability, Defendant USOPC is responsible for the acts and omissions of its officers, directors, employees, agents, and/or representatives, when such acts and omissions are committed in furtherance of their employment or agency relationship with, or committed on behalf of, Defendant USOPC.

148.     Defendant USOPC holds its officers, directors, employees, agents, and/or representatives of Defendant USOPC out as being such to Olympic and Paralympic athletes, including Plaintiff.

149.     Thus, Defendant USOPC is vicariously liable for the foregoing acts and omissions insomuch as said acts and omissions were committed by Defendant USOPC's officers, directors, employees, agents, and/or representatives in furtherance of their employment or agency relationship with Defendant USOPC.

150.     Based on the foregoing, and as detailed more fully herein, Defendant USOPC breached its duties owed to Plaintiff.

151.     As a direct and proximate result of Defendant Griswold's acts and Defendant USOPC's negligence in connection therewith—which includes, but is not necessarily limited to: USOPC's failure to protect Plaintiff from abuse; USOPC's failure to promote a safe environment for Plaintiff; USOPC's failure to supervise Griswold, which allowed a sexual predator to behave in a way that he did; USOPC's failure to warn Plaintiff of the risks posed by Griswold due to his past known conduct regarding abuse and sexual abuse; USOPC's decision to allow Griswold to supervise Plaintiff; USOPC's decision to allow Griswold to sleep in the same room as Plaintiff; USOPC's failure to limit Griswold's contact and interactions with Plaintiff; USOPC's failure to abide by its obligations in the Amateur Sports Act and Safe Sport Act; and USOPC's other wrongful conduct as outlined herein—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Negligent Supervision, Training, Retention, and Entrustment**
**(Against Defendant USOPC)**

152.     Plaintiff incorporates the above allegations as if fully and completely set forth herein.

153.     Defendant USOPC owed a legal duty to adequately supervise Plaintiff, such that Plaintiff would not be subjected to physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

154.     For example, under the Amateur Sports Act, Defendant USOPC maintains a legal duty "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." *See ¶ 69, supra.*

155.     Moreover, under the Safe Sport Act, Defendant USOPC maintains a legal duty to protect athletes from abuse. *See ¶ 23, supra.*

156.     Furthermore, Defendant USOPC maintains a legal duty to properly train its officers, directors, employees, agents, representatives, and/or other athletes to adequately supervise Plaintiff, as well as a legal duty to not retain officers, directors, employees, agents, representatives, and/or other athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

157.     Defendant USOPC's duties in this regard were heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duties exist at the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC and its officers, directors, employees, agents, and/or representatives, who explicitly and implicitly promised to care for, supervise, and protect Plaintiff.

158.    The above duties were further heightened due to numerous prior instances in which Defendant USOPC failed to adequately supervise Olympic and Paralympic athletes; failed to adequately train its officers, directors, employees, agents, representatives, and/or athletes; and retained officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse; and in particular here due to the prior allegation(s) of predatory and behavior by Defendant Griswold, which allegation(s) Defendant USOPC was fully aware of.

159.    USOPC permitted Griswold to supervise Plaintiff, allowed Griswold to sleep in the same bedroom as Plaintiff, and allowed Griswold other time alone with Plaintiff without adult supervision or supervision by USOPC staff. Each of these decisions was under the control of USOPC.

160.    USOPC knew, or should have known, that Griswold would use his position of power and supervision over Plaintiff, his alone time with Plaintiff, and/or the ability to sleep in the same bedroom as Plaintiff as ways to further harm, harass, and/or sexually abuse Plaintiff.

161.    Since USOPC was aware of past claims of sexual abuse and other inappropriate conduct committed by Griswold, USOPC's decision to allow Griswold to supervise Plaintiff, to have extended periods of alone time with Plaintiff, and/or to sleep in the same bedroom as Plaintiff created an unreasonable risk of injury to Plaintiff.

162.    The risk of injury to Plaintiff was foreseeable, since USOPC knew of past claims of harassment, sexual abuse, and/or other untoward conduct of Griswold. The risk of injury to Plaintiff was likewise foreseeable because sexual predators typically leverage their authority positions to commit sexual abuse, sexual predators capitalize on situational constructs where they are able to abuse innocent people because their actions are conducted in private settings away from

third parties (including bedrooms or living facilities such as at the OPTC and at events such athlete quarters at the Tokyo Olympics). At these events, venues, and facilities, USOPC had an ongoing duty to supervise Griswold and Plaintiff and to ensure a safe environment free from abuse and sexual abuse. USOPC's duty, and the foreseeable risk of harm to Plaintiff, was heightened in light of well-documented reports that individuals with cognitive disabilities are far more likely to be subjected to sexual abuse and Griswold's history of engaging in violent, abusive, and sexually inappropriate conduct.

163.    Despite the foregoing, Defendant USOPC failed to adequately supervise Plaintiff and Griswold; failed to adequately train Griswold and USOPC's officers, directors, employees, agents, representatives, and/or athletes; and instead retained officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

164.    Such failures include Defendant USOPC intentionally, recklessly, or at minimum, carelessly, concealing and conspiring with its affiliated entities, including SafeSport, to cover up Defendant Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed; and allowing Plaintiff to room and shower with Defendant Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

165.    Based on the foregoing, and as detailed more fully herein, Defendant USOPC breached its duty to adequately supervise Plaintiff; breached its duty to adequately train its officers, directors, employees, agents, representatives, and/or athletes; breached its duty not to retain officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or

allowing the perpetration of, physical, verbal, and sexual abuse; and was negligent in its entrustment of Griswold as a supervisor and de facto chaperone of Plaintiff.

166.     As a direct and proximate result of Defendant Griswold's acts and Defendant USOPC's negligence in connection therewith—which includes, but is not necessarily limited to: USOPC's failure to protect Plaintiff from abuse; USOPC's failure to promote a safe environment for Plaintiff; USOPC's failure to supervise Griswold, which allowed a sexual predator to behave in a way that he did; USOPC's failure to warn Plaintiff of the risks posed by Griswold due to his past known conduct regarding abuse and sexual abuse; USOPC's decision to allow Griswold to supervise Plaintiff; USOPC's decision to allow Griswold to sleep in the same room as Plaintiff; USOPC's failure to limit Griswold's contact and interactions with Plaintiff; USOPC's failure to abide by its obligations in the Amateur Sports Act and Safe Sport Act; and USOPC's other wrongful conduct as outlined herein—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**Negligent Failure to Warn**
**(Against Defendant USOPC)**

167.     Plaintiff incorporates the above allegations as if fully and completely set forth herein.

168.     Under the Amateur Sports Act, Defendant USOPC maintains a legal duty "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." *See* ¶ 69, *supra.*

169.     Moreover, under the Safe Sport Act, Defendant USOPC maintains a legal duty to protect athletes from abuse. *See* ¶ 23, *supra.*

170.    Defendant USOPC owed a legal duty to protect Plaintiff, such that Plaintiff would not be subjected to physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold. Inherent in that duty, is the duty to warn Plaintiff and his parents, of the significant and foreseeable risk of danger Defendant Griswold posed, particularly in light of USOPC's decision to allow Griswold to supervise Plaintiff and sleep in the same bedroom as Plaintiff, even after USOPC was informed of allegations of sexual abuse committed by Griswold.

171.    Defendant USOPC's duty to warn was heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duty existed prior to Plaintiff going to, as well as at, the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC and its officers, directors, employees, agents, and/or representatives.

172.    The above duty was further heightened due to numerous prior instances in which Defendant USOPC failed to warn Olympic and Paralympic athletes of officers, directors, employees, agents, representatives, and/or other athletes who had perpetrated, or were capable of perpetrating, physical, verbal, and sexual abuse; and thereby allowed such abuse to occur.

173.    Despite the foregoing, Defendant USOPC failed to warn Plaintiff and his parents of the prior allegation(s) of predatory and abusive behavior perpetrated by Defendant Griswold, which allegation(s) Defendant USOPC concealed and conspired with its affiliated entities, including SafeSport, to cover up.

174.    Based on the foregoing, and as detailed more fully herein, Defendant USOPC breached its duty to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed.

175.    As a direct and proximate result of Defendant Griswold's acts and Defendant USOPC's negligence in connection therewith—which includes, but is not necessarily limited to: USOPC's failure to protect Plaintiff from abuse; USOPC's failure to promote a safe environment for Plaintiff; USOPC's failure to supervise Griswold, which allowed a sexual predator to behave in a way that he did; USOPC's failure to warn Plaintiff of the risks posed by Griswold due to his past known conduct regarding abuse and sexual abuse; USOPC's decision to allow Griswold to supervise Plaintiff; USOPC's decision to allow Griswold to sleep in the same room as Plaintiff; USOPC's failure to limit Griswold's contact and interactions with Plaintiff; USOPC's failure to abide by its obligations in the Amateur Sports Act and Safe Sport Act; and USOPC's other wrongful conduct as outlined herein—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### Gross Negligence
### (Against Defendant USOPC)

176.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

177.    Under the Amateur Sports Act, Defendant USOPC maintains a legal duty "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." *See* ¶ 69, *supra.*

178.    Moreover, under the Safe Sport Act, Defendant USOPC maintains a legal duty to protect athletes from abuse. *See* ¶ 23*, supra.*

179.    Defendant USOPC owed a legal duty to protect Plaintiff from physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

180.    Defendant USOPC's duty to protect was heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duty exists at the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC, who explicitly and implicitly promised to care for and protect Plaintiff.

181.    The duty to protect was further heightened due to numerous prior instances in which Defendant USOPC failed to protect Olympic and Paralympic athletes, and in particular here due to the prior allegation(s) of predatory and behavior by Defendant Griswold, which allegation(s) Defendant USOPC was fully aware of.

182.    Despite the foregoing, Defendant USOPC failed to adequately protect Plaintiff, and in fact, engaged in intentional and reckless conduct, including turning a blind eye-to and/or conspiring with its affiliated entities, including SafeSport, to cover up Defendant Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed; and allowing Plaintiff to room and shower with Defendant Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

183.    Based on the foregoing, and as detailed more fully herein, Defendant USOPC breached its duty to protect Plaintiff.

184.    As a direct and proximate result of Defendant Griswold's acts and Defendant USOPC's gross negligence in connection therewith—which includes, but is not necessarily limited

to: USOPC's failure to protect Plaintiff from abuse; USOPC's failure to promote a safe environment for Plaintiff; USOPC's failure to supervise Griswold, which allowed a sexual predator to behave in a way that he did; USOPC's failure to warn Plaintiff of the risks posed by Griswold due to his past known conduct regarding abuse and sexual abuse; USOPC's decision to allow Griswold to supervise Plaintiff; USOPC's decision to allow Griswold to sleep in the same room as Plaintiff; USOPC's failure to limit Griswold's contact and interactions with Plaintiff; USOPC's failure to abide by its obligations in the Amateur Sports Act and Safe Sport Act; and USOPC's other wrongful conduct as outlined herein—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, entitling Plaintiff to damages, in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
#### Premises Liability
#### (Against Defendant USOPC)

185. Plaintiff incorporates the above allegations as if fully and completely set forth herein.

186. At all times when Plaintiff was participating in the Tokyo Games, where the first instances of verbal, physical, and sexual abuse described herein occurred, USOPC was not the landowner, but controlled and conducted activity on the premises where both Plaintiff and Griswold roomed and was responsible for appointing Griswold to be Plaintiff's roommate and de facto chaperone while participating in the Tokyo Games.

187. While participating in the Tokyo Games, Plaintiff was a tenant residing at the facilities where athletes participating in the Tokyo Games were housed and USOPC expressly invited him to enter and remain on the premises to live in the athlete dormitory USOPC controlled while he participated in the Tokyo Games for the mutual benefit of both Plaintiff and USOPC.

Plaintiff was given USOPC's permission and consent to use the facilities and reside in the athlete dormitory USOPC controlled for the purpose of training and preparing for competition.

188.    While Plaintiff was at the Tokyo Games, USOPC regularly monitored its athletes' conduct in living quarters and, thus, operated its business or conducted its activities in a way that would make the danger that Griswold posed as Plaintiff's roommate and de facto chaperone continuous and readily foreseeable.

189.    Based on information and belief, at all relevant times, USOPC was the owner of the OPTC in Colorado Springs, where much of the verbal, physical, and sexual abuse described herein occurred.

190.    Plaintiff was a tenant at the OPTC and USOPC expressly invited him to enter and remain on the premises to live in its athlete dormitory while he trained and prepared for Paralympic competition for the mutual benefit of both Plaintiff and USOPC. Plaintiff was given USOPC's permission and consent to use its facilities and live in its athlete dormitory for the purpose of training and preparing for Paralympic competition.

191.    At all relevant times, USOPC had actual knowledge that Griswold posed a danger to others present at the Tokyo Games and at the OPTC based past claims of harassment, sexual abuse, and other conduct of Griswold and its investigation into those allegations.

192.    USOPC knew or should have known that Griswold would use his position of power and supervision over Plaintiff, his alone time with Plaintiff, and the ability to sleep in the same bedroom as Plaintiff as ways to further harm, harass, and/or sexually abuse Plaintiff.

193.    USOPC created the hazard that resulted in the abuse described herein by appointing Griswold Plaintiff's roommate and de facto chaperone at both the Tokyo Games and at the OPTC.

194.   USOPC failed to warn Plaintiff and his family of the danger Griswold posed as a sexual predator. A reasonable person would expect such facts to be disclosed as sexual predators would not ordinarily be permitted to cohabitate in a dormitory with other athletes, particularly those who are underage or vulnerable to abuse such as Plaintiff.

195.   USOPC failed to exercise reasonable care to protect Plaintiff against the danger posed by Griswold of which it actually knew or should have known. By its appointing Griswold as Plaintiff's roommate and de facto chaperone and concealing known and credible allegations that Griswold had a history harassment, sexual abuse, and/or other untoward conduct, USOPC created a condition or circumstances that were likely to threaten the safety of Plaintiff.

196.   Plaintiff would not have been injured had USOPC exercised reasonable care to protect him from the hazard posed by Griswold, such as precluding Griswold from cohabiting with, training with, showering with, and serving as de facto chaperone for Plaintiff, or warning Plaintiff and his family of the danger Griswold posed based on credible allegation of prior sexual misconduct.

197.   As a direct and proximate result of Defendant USOPC's failure to exercise reasonable care to protect and warn Plaintiff of the dangerous condition or circumstance on its premises and its creation of the dangerous condition or circumstance that caused Plaintiff's injuries, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, entitling Plaintiff to damages, in an amount to be determined at trial.

198.   Plaintiff pleads this claim for relief against USOPC in the alternative to other claims and remedies pleaded against USOPC herein.

## ~~SEVENTH CLAIM FOR RELIEF~~
### ~~Negligence~~

**(Against Defendant SafeSport)**

189. Plaintiff incorporates the above allegations as if fully and completely set forth herein.

190. Defendant SafeSport maintains a legal duty to protect Plaintiff from physical, verbal, and sexual abuse, especially that perpetrated by USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

191. For example, under the Safe Sport Act, among a myriad of obligations, Defendant SafeSport maintains a legal duty to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse." *See* ¶ 24, *supra*.

192. Defendant SafeSport's duty to protect Plaintiff is heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duty exists at the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of USOPC, who explicitly and implicitly promised to care for and protect Plaintiff.

193. The duty to protect was further heightened due to numerous prior instances in which USOPC failed to adequately supervise Olympic and Paralympic athletes, and in particular here due to the prior allegation(s) of predatory and behavior by Defendant Griswold, which allegation(s) USOPC and SafeSport were fully aware of.

194. SafeSport also had a special relationship with Plaintiff given the fact that Plaintiff had developmental disabilities and was under the care and control of USOPC while at USOPC facilities and USOPC events.

195. Despite the foregoing, Defendant SafeSport failed to adequately protect Plaintiff, and in fact, engaged in intentional, reckless, or at minimum, careless behavior, including

concealing and conspiring with its affiliated entities, including USOPC, to cover up Defendant Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Griswold posed; and allowing Plaintiff to room and shower with Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

196.   Under the theory of vicarious liability, Defendant SafeSport is indirectly responsible for the acts and omissions of its officers, directors, employees, agents, and/or representatives, when such acts and omissions are committed in furtherance of their employment or agency relationship with, or committed on behalf of, Defendant SafeSport.

197.   Defendant SafeSport holds its officers, directors, employees, agents, and/or representatives of Defendant SafeSport out as being such to Olympic and Paralympic athletes, including Plaintiff.

198.   Thus, Defendant SafeSport is vicariously liable for the foregoing acts and omissions insomuch as said acts and omissions were committed by Defendant SafeSport's officers, directors, employees, agents, and/or representatives in furtherance of their employment or agency relationship with Defendant SafeSport.

199.   Based on the foregoing, and as detailed more fully herein, Defendant SafeSport breached its duty to protect Plaintiff.

200.   As a direct and proximate result of Defendant Griswold's acts and Defendant SafeSport's negligence in connection therewith—which includes, but is not necessarily limited to: SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with explicit and implicit obligations in the Safe Sport Act, which include, for example, an obligation to protect athletes from abuse, ensure athlete supervisors are qualified to be supervisors, ensure athlete supervisors are properly vetted

as individuals who are equipped to supervise other athletes, supervise athletes who pose an increased risk of harm to others, and/or isolate athletes who pose an increased risk of harm to others; SafeSport's failure to notify Plaintiff of the unreasonable and foreseeable risk of harm from Griswold; SafeSport's negligent entrustment and failure to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC and thus maintain the necessary independence in SafeSport's function as an enforcer of the Safe Sport Act. Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Negligent Supervision, Training, Retention, and Entrustment

### (Against Defendant SafeSport)

201.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

202.    Defendant SafeSport owed a legal duty to adequately supervise Plaintiff, such that Plaintiff would not be subjected to physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

203.    For example, under the Safe Sport Act, among a myriad of obligations, Defendant SafeSport maintains a legal duty to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse." *See* ¶ 24, *supra*.

204. Furthermore, Defendant SafeSport maintains a legal duty to properly train its officers, directors, employees, agents, representatives, and/or other athletes to adequately supervise Plaintiff, as well as a legal duty to not retain officers, directors, employees, agents, representatives, and/or other athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

205. Defendant SafeSport's duties in this regard were heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duties exist at the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC and its officers, directors, employees, agents, and/or representatives, who explicitly and implicitly promised to care for, supervise, and protect Plaintiff.

206. The above duties were further heightened due to numerous prior instances in which Defendant USOPC failed to adequately supervise Olympic and Paralympic athletes; failed to adequately train its officers, directors, employees, agents, representatives, and/or athletes; and retained officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse; and in particular here due to the prior allegation(s) of predatory and behavior by Defendant Griswold, which allegation(s) Defendants USOPC and SafeSport were fully aware of.

207. SafeSport permitted Griswold to supervise Plaintiff, allowed Griswold to sleep in the same bedroom as Plaintiff, and allowed Griswold other time alone with Plaintiff without adult supervision or supervision by USOPC staff. Each of these decisions was under the control of USOPC and SafeSport.

208. SafeSport knew, or should have known, that Griswold would use his position of power and supervision over Plaintiff, his alone time with Plaintiff, and the ability to sleep in the same bedroom as Plaintiff as ways to further harm, harass, and/or sexually abuse Plaintiff.

209. Since SafeSport was aware of past claims of sexual abuse and other inappropriate conduct against Griswold, SafeSport's decision to allow Griswold to supervise Plaintiff, to have extended periods of alone time with Plaintiff, and to sleep in the same bedroom as Plaintiff created an unreasonable risk of injury to Plaintiff.

210. The risk of injury to Plaintiff was foreseeable, since SafeSport knew of past claims of harassment, sexual abuse, and/or other untoward conduct of Griswold. The risk of injury to Plaintiff was likewise foreseeable because sexual predators typically leverage their authority positions to commit sexual abuse, sexual predators capitalize on situational constructs where they are able to abuse innocent people because their actions are conducted in private settings away from third parties (including bedrooms or living facilities, such as at the OPTC, and at events, such as at athlete quarters at the Tokyo Olympics). At these events, venues, and facilities, SafeSport had an ongoing duty to supervise Griswold and Plaintiff and to ensure a safe environment free from abuse and sexual abuse. SafeSport's duty, and the foreseeable risk of harm to Plaintiff, was heightened in light of well-documented reports that individuals with cognitive disabilities are far more likely to be subjected to sexual abuse.

211. Despite the foregoing, Defendant SafeSport failed to adequately train SafeSport's officers, directors, employees, agents, representatives, and/or athletes; and instead retained officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

212.    Such failures include Defendant SafeSport intentionally, recklessly, or at minimum, carelessly, concealing and conspiring with its affiliated entities, including USOPC, to cover up Defendant Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed; and allowing Plaintiff to room and shower with Defendant Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

213.    Based on the foregoing, and as detailed more fully herein, Defendant SafeSport breached its duty to adequately train its officers, directors, employees, agents, representatives, and/or athletes; breached its duty not to retain officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse; and was negligent in its entrustment of Griswold as a supervisor of Plaintiff.

214.    As a direct and proximate result of Defendant Griswold's acts and Defendant SafeSport's negligence in connection therewith—which includes, but is not necessarily limited to: SafeSport's failure to institute adequate and reasonable policies and procedures to investigative abuse allegations; SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with explicit and implicit obligations in the Safe Sport Act, which include, for example, an obligation to protect athletes from abuse, ensure athlete supervisors are qualified to be supervisors, ensure athlete supervisors are properly vetted as individuals who are equipped to supervise other athletes, supervise athletes who pose an increased risk of harm to others, and/or isolate athletes who pose an increased risk of harm to others; SafeSport's failure to notify Plaintiff of the unreasonable and foreseeable risk of harm from Griswold; SafeSport's negligent entrustment and failure to take

appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC and thus maintain the necessary independence in SafeSport's function as an enforcer of the Safe Sport Act—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
**Negligent Failure to Warn**
**(Against Defendant SafeSport)**

215.   Plaintiff incorporates the above allegations as if fully and completely set forth herein.

216.   Under the Safe Sport Act, among a myriad of obligations, Defendant SafeSport maintains a legal duty to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse." *See* ¶ 24, *supra.*

217.   Defendant SafeSport owed a legal duty to protect Plaintiff, such that Plaintiff would not be subjected to physical, verbal, and sexual abuse, especially that perpetrated by USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold. Inherent in that duty is the duty to warn Plaintiff and his parents of the significant and foreseeable risk of danger Griswold posed, particularly in light of USOPC and SafeSport's decision to allow Griswold to supervise Plaintiff and sleep in the same bedroom as Plaintiff, even after USOPC and SafeSport were informed of allegations of sexual abuse committed by Griswold.

218.   Defendant SafeSport's duty to warn was heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more

vulnerable to abuse, and such duty existed prior to Plaintiff going to, as well as at, the OPTC and the Olympic and Paralympic Games, where Plaintiff was in the sole custody and care of Defendant USOPC and its officers, directors, employees, agents, and/or representatives, and subject to SafeSport's SafeSport Code.

219.   The above duty was further heightened due to numerous prior instances in which Defendant SafeSport failed to warn Olympic and Paralympic athletes of officers, directors, employees, agents, representatives, and/or other athletes who had perpetrated, or were capable of perpetrating, physical, verbal, and sexual abuse; and thereby allowed such abuse to occur.

220.   Despite the foregoing, Defendant SafeSport failed to warn Plaintiff and his parents of the prior allegation(s) of predatory and abusive behavior perpetrated by Griswold, which allegation(s) Defendant SafeSport turned a blind-eye to and/or conspired with its affiliated entities, including USOPC, to cover up.

221.   Based on the foregoing, and as detailed more fully herein, Defendant SafeSport breached its duty to warn Plaintiff and his parents of the significant risk of danger Defendant Griswold posed.

222.   As a direct and proximate result of Defendant Griswold's acts and Defendant SafeSport's negligence in connection therewith – which includes, but is not necessarily limited to: SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with explicit and implicit obligations in the Safe Sport Act, which include, for example, an obligation to protect athletes from abuse, ensure athlete supervisors are qualified to be supervisors, ensure athlete supervisors are properly vetted as individuals who are equipped to supervise other athletes, supervise athletes who pose an increased risk of harm to others, and/or isolate athletes who pose an increased risk of harm to

others; SafeSport's failure to notify Plaintiff of the unreasonable and foreseeable risk of harm from Griswold; SafeSport's negligent entrustment and failure to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC and thus maintain the necessary independence in SafeSport's function as an enforcer of the Safe Sport Act—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**TENTH CLAIM FOR RELIEF**
**Gross Negligence**
**(Against Defendant SafeSport)**

223.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

224.    Under the Safe Sport Act, among a myriad of obligations, Defendant SafeSport maintains a legal duty to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse." *See* ¶ 24, *supra*.

225.    Defendant SafeSport owed a legal duty to protect Plaintiff from physical, verbal, and sexual abuse, especially that perpetrated by Defendant USOPC's officers, directors, employees, agents, representatives, and/or other athletes, such as Defendant Griswold.

226.    Defendant SafeSport's duty to protect was heightened due to Plaintiff's severe intellectual disabilities and physical limitations, which make Plaintiff significantly more vulnerable to abuse, and such duty exists at the OPTC and the Olympic and Paralympic Games,

where Plaintiff was in the sole custody and care of Defendant USOPC, who explicitly and implicitly promised to care for and protect Plaintiff.

227.    The duty to protect was further heightened due to numerous prior instances in which Defendants USOPC and SafeSport failed to protect Olympic and Paralympic athletes, and in particular here due to the prior allegation(s) of predatory and behavior by Griswold, which allegation(s) Defendant SafeSport was fully aware of.

228.    Despite the foregoing, Defendant SafeSport failed to adequately protect Plaintiff, and in fact, engaged in intentional and reckless conduct, including turning a blind eye to and/or conspiring with its affiliated entities, including USOPC, to cover up Griswold's history of predatory and abusive behavior; failing to warn Plaintiff and his parents of the significant risk of danger Griswold posed; and allowing Plaintiff to room and shower with Griswold without any, let alone adequate, safeguards in place to ensure Plaintiff's safety.

229.    Based on the foregoing, and as detailed more fully herein, Defendant SafeSport breached its duty to protect Plaintiff.

230.    As a direct and proximate result of Defendant Griswold's acts and Defendant SafeSport's gross negligence in connection therewith – which includes, but is not necessarily limited to: SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with explicit and implicit obligations in the Safe Sport Act, which include, for example, an obligation to protect athletes from abuse, ensure athlete supervisors are qualified to be supervisors, ensure athlete supervisors are properly vetted as individuals who are equipped to supervise other athletes, supervise athletes who pose an increased risk of harm to others, and/or isolate athletes who pose an increased risk of harm to others; SafeSport's failure to notify Plaintiff of the unreasonable and foreseeable risk of

~~harm from Griswold; SafeSport's negligent entrustment and failure to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC and thus maintain the necessary independence in SafeSport's function as an enforcer of the Safe Sport Act—Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, entitling Plaintiff to damages, in an amount to be determined at trial.~~

## ~~ELEVENTH~~ EIGHTH CLAIM FOR RELIEF
### Express/Implied Agency
### (Against Defendants Griswold and USOPC~~, and SafeSport~~)

199.     Plaintiff incorporates the above allegations as if fully and completely set forth herein.

200.     When Defendant USOPC assigned Griswold to be a supervisor over Plaintiff, explicit and/or implicit in that assignment was that USOPC was authorizing Griswold to act as an agent of USOPC insofar as Griswold was responsible for protecting Plaintiff pursuant to the rules and guidelines created by USOPC.

201.     Defendant Griswold is in an agency relationship with, and was authorized to act on behalf of, Defendant USOPC in connection with his supervisory role over Plaintiff.

202.     The agency relationship is one of principal (Defendant USOPC) and agent (Defendant Griswold), as Defendant USOPC expressly or implicitly holds Griswold out as being an agent of Defendant USOPC when Griswold was acting in furtherance of his responsibilities to serve as a USOPC-appointed supervisor over Plaintiff.

203.    Plaintiff was injured due to his and his parents' reliance on: Defendant USOPC's assurances that Griswold was a safe and appropriate supervisor for Plaintiff; Defendant USOPC's assurances that Griswold was not harmful to Plaintiff and did not pose an unreasonable risk of harm to Plaintiff; Defendant USOPC's assurances that Griswold, in his USOPC-appointed role as a supervisor over Plaintiff, would be appropriately supervised by other USOPC staff; Defendant USOPC's ~~and Defendant SafeSport's~~ assurances that USOPC ~~and SafeSport~~ wase complying with ~~their respective~~ its legal obligations, including but not limited to ~~their respective~~ its obligations under the Amateur Sports Act and Safe Sport Act to ensure that Plaintiff is not subjected to abuse, including but not limited sexual abuse; Griswold's assurances that he would be an appropriate supervisor over Plaintiff; Griswold's assurances that he would comply with his obligations to not harm or sexually assault Plaintiff; and Griswold's assurances that he would comply with his obligations as a USOPC-appointed supervisor. Plaintiff—as a direct and proximate result of the failure of Defendants USOPC and Griswold ~~and SafeSport~~ to comply with the aforementioned assurances—has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**~~TWELFTH~~ NINTH CLAIM FOR RELIEF**
**Fraud and Misrepresentation**
**(Against Defendant USOPC)**

204.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

205.    Defendant USOPC made representations of material fact to Plaintiff and Plaintiff's parents, including representing that Plaintiff would be adequately supervised and protected, and that the OPTC was a safe environment. Specifically, Plaintiff's parents met in person with a

Director of U.S. Paralympic Swimming and a USOPC Coach & High Performance Sports Director in December 2021. This meeting took place after USOPC had learned of prior allegations of sexual assault by Griswold and after Griswold had already been appointed Plaintiff's roommate and de facto chaperone at the Tokyo Games but before Plaintiff moved to Colorado Springs to train at the OPTC. In this meeting, the USOPC representatives expressed to Plaintiff's parents that Plaintiff would be safe at the facility and protected by virtue of supervision while he was on campus and away from his parents. Based on prior allegations, USOPC was aware that athletes training at the OPTC were not, in fact, supervised when left alone with Griswold at the OPTC and that he posed a hazard to other Paralympic athletes, including Plaintiff, when left alone with them.

206.    Defendant USOPC's employee or agent, Plaintiff's Paralympic Swimming coach, also made a representation of material fact to Plaintiff and Plaintiff's parents; namely, that Defendant Griswold would be moving out of the OPTC. Specifically, on July 9, 2022, Plaintiff's mother met in person with a USOPC Coach & High Performance Sports Director in Colorado Springs where he stated to Plaintiff's mother that Griswold would be getting married and moving to Florida and would now be "Abby's problem," referring to Griswold's fiancée. Griswold left Colorado Springs in August, but returned just days later and resumed living and training at the OPTC. Based on the fact that Griswold left the Colorado Springs facility for his wedding and returned just days later, Plaintiff claims on information and belief that USOPC, which controlled and monitored who was permitted to enter and reside on the premises of the OPTC, and would not have allowed Griswold to return so abruptly without notice, was aware that Griswold was not, in fact, permanently moving away and that he intended to return and continue training and residing in Colorado Springs.

207.    The above representations were false when made, and due to, among other things, the sheer number of complaints of abuse made to, and learned by, Defendant USOPC over the years; Defendant USOPC's knowledge of its own policies and procedures in connection with supervising and protecting Plaintiff; and Defendant's knowledge of prior allegation(s) of predatory and abusive behavior by Defendant Griswold, Defendant USOPC knew, or should have known, that said misrepresentations were false at the time of making them.

208.    Plaintiff and his parents were ignorant to the falsity of the above representations and relied on such in allowing Plaintiff to move into, train, and subsequently remain, at the OPTC.

209.    Defendant USOPC's made the above representations for the purpose, and with the intention, of causing Plaintiff and his parents to rely on such representations.

210.    As a direct and proximate result of Defendant USOPC's fraud and misrepresentation, as outlined herein, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### Fraudulent Concealment
### (Against Defendant USOPC)

211.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

212.    Defendant USOPC withheld and concealed material facts from Plaintiff and his parents that, in equity and good conscience, should be have been disclosed to them. This included concealing from Plaintiff and his parents the fact that Paralympic athletes who trained at the OPTC were left unsupervised with other athletes who had been accused of sexual assault, concealing from Plaintiff and his parents the fact that Plaintiff would not be monitored or supervised for safety

while training at the OPTC, concealing from Plaintiff and his parents the fact that Griswold had a history of sexual and physical abuse allegations against him from other Paralympic athletes when Griswold was assigned to be Plaintiff's roommate and de facto chaperone, and concealing from Plaintiff's parents the fact that Griswold had returned to the OPTC in August 2022 when they had been told he would be moving away from the facility permanently.

213.    Based on information and belief, Defendant USOPC knew these facts and knew they were being concealed from Plaintiff and his parents. USOPC knew from prior allegations that athletes were frequently left alone with Griswold in unsupervised settings where their safety was in jeopardy. USOPC knew from prior allegations that Griswold posed a hazard to other athletes, particularly that he was prone to commit unwanted sexual and physical acts and abuse of other Paralympians. USOPC knew that Griswold had returned to the OPTC after his short time away because it controlled and monitored who entered and resided on the premises of the OPTC. USOPC knew these facts were being concealed from Plaintiff and Plaintiff's parents because they had detailed conversations about safety at the OPTC facility before Plaintiff moved there, knew these issues were a material concern for Plaintiff and his parents, and withheld them in those conversations.  and the facts regarding prior allegations against Griswold were known at the time, had inquired about the

214.    Plaintiff and his parents were ignorant of these facts. They believed that athletes at the OPTC were supervised because USOPC representatives had stated they were. They were unaware of the allegations against Griswold, which were suppressed by USOPC from public knowledge, and Plaintiff's parents were unaware that Griswold was returning to the OPTC after just days away in August 2022 because they were told he was moving away permanently.

215.     Based on information and belief, USOPC intentionally concealed the facts because of its desire to protect its reputation and that of Griswold, its star athlete. Based on information and belief, USOPC concealed these facts with the intent to cause Plaintiffs to participate as a Paralympic athlete and reside and train at the OPTC.

216.     Plaintiff was harmed when he and his parents acted on their false beliefs that USOPC provided a safe environment for Paralympic athletes, such as Plaintiff, and that the OPTC was a safe place for him to train and reside under supervision of others who would keep him safe. Plaintiff was further harmed when he and his parents allowed Plaintiff to continue to reside at the OPTC based on the belief that Griswold would be leaving the facility permanently. As a direct and proximate result of USOPC's concealments, as outlined herein, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

### ~~THIRTEENTH CLAIM FOR RELIEF~~
### ~~Fraud and Misrepresentation~~
### ~~(Against Defendant SafeSport)~~

~~243.   Plaintiff incorporates the above allegations as if fully and completely set forth herein.~~

~~244.   Defendant SafeSport made representations of material fact to Plaintiff and Plaintiff's parents, including representing that: SafeSport would comply with the obligations in the Safe Sport Act, for example, to protect athletes from abuse; SafeSport would notify Plaintiff of unreasonable and foreseeable risk of harm, including but not limited to unreasonable and foreseeable risk of harm from Griswold; SafeSport would take appropriate steps to prevent Griswold from harassing and sexually assaulting Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the~~

~~SafeSport Code; and SafeSport would take reasonable steps to remain independent from the USOPC in its function as a maker and enforcer of safety rules.~~

~~245.    The above representations were false when made, and due to, among other things, the sheer number of complaints of abuse made to, and learned by, Defendant SafeSport over the years; Defendant SafeSport's knowledge of its own policies and procedures in connection with supervising and protecting Plaintiff; and Defendant SafeSport's knowledge of prior allegation(s) of predatory and abusive behavior by Defendant Griswold, Defendant SafeSport knew, or should have known, that said misrepresentations were false at the time of making them.~~

~~246.    Plaintiff and his parents were ignorant to the falsity of the above representations, and relied on such in allowing Plaintiff to move into, train, and subsequently remain, at the OPTC.~~

~~247.    Defendant SafeSport made the above representations for the purpose, and with the intention, of causing Plaintiff and his parents to rely on such representations.~~

~~248.    As a direct and proximate result of Defendant SafeSport's fraud and misrepresentation, as outlined herein, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.~~

### ~~FOURTEENTH~~ ELEVENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Against Defendants Griswold and USOPC~~, and SafeSport~~)

217.    Plaintiff incorporates the above allegations in paragraphs as if fully and completely set forth herein.

218.    Defendant USOPC acted intentionally and/or recklessly in failing to supervise and protect Plaintiff from, and failing to warn Plaintiff and his parents of, the significant risk of danger Defendant Griswold posed; failing to adequately train its officers, directors, employees, agents,

representatives, and/or other athletes; and retaining officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

219.    Defendant USOPC's acts and omissions, including those set forth above, were extreme and outrageous, especially under the circumstances present here, i.e., Plaintiff having severe physical and mental disabilities that render him exceptionally vulnerable to perpetrators of abuse, such as Defendant Griswold.

220.    Defendant Griswold's intentional acts—including his physical, verbal, and sexual abuse of Plaintiff—constitute extreme and outrageous conduct.

221.    Defendant SafeSport's intentional acts—including SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with the obligations in the Safe Sport Act, for example, to protect athletes from abuse; failed to notify Plaintiff of the unreasonable and foreseeable risk of harm from Griswold; SafeSport's failure to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; SafeSport's failure to take appropriate steps to prevent Griswold from harassing and sexually assaulting Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC in its function as a maker and enforcer of safety rules—constitute extreme and outrageous conduct.

221.    As a direct and proximate result of Defendants Griswold, SafeSport, and USOPC's intentional and/or reckless acts and omissions—each of which constitutes extreme and outrageous

conduct—Plaintiff has suffered, among other damages, severe and ongoing mental and emotional distress, and is therefore entitled to damages, in an amount to be determined at trial.

<strong>~~FIFTEENTH~~ TWELFTH CLAIM FOR RELIEF<br>Negligent Infliction of Emotional Distress<br>(Against Defendants Griswold and USOPC~~, and SafeSport~~)</strong>

222.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

223.    Defendant USOPC acted negligently in failing to supervise and protect Plaintiff from, and failing to warn Plaintiff and his parents of, the significant risk of danger Defendant Griswold posed; failing to adequately train its officers, directors, employees, agents, representatives, and/or other athletes; and retaining officers, directors, employees, agents, representatives, and/or athletes capable of perpetrating, or allowing the perpetration of, physical, verbal, and sexual abuse.

224.    In doing so, Defendant USOPC created, and in fact, fostered, an unreasonable risk of harm to Plaintiff, which caused, and continues to cause, Plaintiff to fear for his safety, as well as his life.

225.    Plaintiff's fear for his safety and life, in connection with the foregoing acts and omissions of Defendant USOPC, has caused, and continues to cause, Plaintiff severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

226.    Defendant Griswold acted negligently in physically, verbally, and sexually abuse Plaintiff.

227.    In doing so, Defendant Griswold created, and in fact, fostered, an unreasonable risk of harm to Plaintiff, which caused, and continues to cause, Plaintiff to fear for his safety, as well as his life.

228.    Plaintiff's fear for his safety and life, in connection with the foregoing acts and omissions of Defendant Griswold, has caused, and continues to cause, Plaintiff severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

229.    ~~Defendant SafeSport's negligent acts or omissions include SafeSport's failure to hire and train employees and others who were charged with carrying out SafeSport's responsibilities; SafeSport's failure to comply with the obligations in the Safe Sport Act, for example, to protect athletes from abuse; failed to notify Plaintiff of the unreasonable and foreseeable risk of harm from Griswold; SafeSport's failure to take appropriate steps to prevent Griswold from serving as a supervisor to Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; SafeSport's failure to take appropriate steps to prevent Griswold from harassing and sexually assaulting Plaintiff while Plaintiff was under the custody and control of USOPC and Griswold was subject to oversight by SafeSport and bound by the SafeSport Code; and SafeSport's failure to take reasonable steps to remain independent from the USOPC in its function as a maker and enforcer of safety rules~~

230.    ~~In doing so, Defendant SafeSport created, and in fact, fostered, an unreasonable risk of harm to Plaintiff, which caused, and continues to cause, Plaintiff to fear for his safety, as well as his life.~~

229.    Plaintiff's fear for his safety and life, in connection with the foregoing acts and omissions ~~of Defendant SafeSport~~, has caused, and continues to cause, Plaintiff severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

**~~SIXTEENTH~~ THIRTEENTH CLAIM FOR RELIEF**
**Civil Conspiracy**
**(Against Defendant USOPC ~~and SafeSport~~)**

230.    Plaintiff incorporates the above allegations as if fully and completely set forth herein.

231.    Defendant USOPC and SafeSport were notified of disturbing allegations, and were provided supporting evidence, concerning Defendant Griswold engaging in predatory and abusive behavior on at least one prior occasion, and upon information belief, had actual knowledge of multiple prior instances, or at minimum reasonable allegations, of physical, verbal, and sexual abuse perpetrated by Defendant Griswold.

232.    Despite such prior knowledge, Defendant USOPC came to an agreement, i.e., conspired, with its affiliated entities, including SafeSport, to conceal and cover up such allegations, and the results of investigations conducted in connection therewith.

233.    Defendant USOPC committed overt acts in furtherance of its agreement with its affiliated entities, including SafeSport, which overt acts included carrying out the purpose of the conspiracy by covering up, and withholding from Plaintiff and others, the allegations of abusive and predatory behavior against Defendant Griswold, as well as the results of investigations conducted in connection therewith.

234.    By engaging in the above conduct, Defendant USOPC ~~and SafeSport~~ placed Plaintiff, as well as many other Olympic and Paralympic athletes—some of which have severe

physical and mental disabilities, which make the particularly vulnerable to perpetrators of abuse, such as Defendant Griswold—in significant danger of harm, thereby allowing Defendant Griswold to continue physically, verbally, and sexually abuse Plaintiff.

235.    As a direct and proximate result of the foregoing, Plaintiff has suffered, among other damages, severe physical injuries, pain and suffering, and extreme mental and emotional distress, which is ongoing. Plaintiff is therefore entitled to damages, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as set forth below:

1. Compensatory and general damages in an amount to be determined at trial, but not less than the $75,000 jurisdictional limit (exclusive of interest and costs);

2. ~~Punitive,~~ Statutory and exemplary damages;

3. Prejudgment interest as provided by law;

4. Interest upon any judgment entered as provided by law;

5. Attorney's fees and costs as provided to law;

6. Injunctive relief prohibiting Griswold from participating in any USOPC activity or event; and

7. Such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated:  ~~November 10, 2022~~ _____, 2023

By:    _____
       Frank Salzano, Esq.
       Salzano Ettinger Lampert & Wilson LLP
       275 Madison Ave., Floor 35
       New York, New York 10016
       Tel: (646) 863-1883
       Fax: (646) 365-3119
       E-mail: fsalzano@selwlaw.com


       s/ Elizabeth Kramer
       Elizabeth A. Kramer, Esq.
       Erickson Kramer Osborne LLP
       44 Tehama Street
       San Francisco, California 94105

Phone: (415) 635-0631
Fax: (415) 599-8088
E-mail: elizabeth@eko.law

*Attorneys for Plaintiff Parker Egbert*